SLIP OP.  09-13

## UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————— :
GEO SPECIALTY CHEMICALS, INC.,    :
    :
           Plaintiff,    :    Before: Jane A. Restani, Chief Judge
      v.    :
    :    Court No.  08-00046
UNITED STATES,    :
    :    **Public Version**
    :
           Defendant.    :
————————————————————:

## OPINION

[Plaintiff's motion for judgment on the agency record denied.]

Dated: February 19, 2009

        Thompson Hine LLP (Matthew R. Nicely, Gregory Husisian, and Jennifer L. Stein) for the plaintiff.

        James M. Lyons, General Counsel, Neal J. Reynolds, Assistant General Counsel, U.S. International Trade Commission (Charles A. St. Charles) for the defendant.

        Restani, Chief Judge:  This matter is before the court on plaintiff GEO Specialty Chemicals, Inc.'s ("GEO") motion for judgment on the agency record pursuant to USCIT Rule 56.2.  Plaintiff, a domestic producer of glycine, challenges the final determination of the U.S. International Trade Commission ("Commission") in the antidumping investigations of glycine from India, Japan, and Korea.  See Glycine From India, USITC Pub. No. 3997, Inv. No. 731-TA-1111 (May 2008), available at http://hotdocs.usitc.gov/docs/pubs/701_731/pub3997.pdf ("Final India Determination"); Glycine From Japan and Korea, USITC Pub. No. 3980, Inv. Nos. 731-TA-1112-1113 (Jan. 2008), available at http://hotdocs.usitc.gov/docs/pubs/701_731/pub3980.pdf ("Final Japan & Korea Determination").  For the reasons stated below, the court finds that the

Commission's determination that the domestic glycine industry was not materially injured or

threatened with material injury by reason of imports was supported by substantial evidence and

is in accordance with law, and the court denies GEO's motion.

## BACKGROUND

Glycine is an amino acid that is manufactured and sold in three grades: United

States Pharmacopeia ("USP"), pharmaceutical, and technical.  Final Japan & Korea

Determination at 3.  USP grade glycine, which is used as a sweetener/taste enhancer or buffering

agent primarily in pet food, animal feed, and antiperspirants, id., accounted for [[   ]] of reported

U.S. shipments of subject imports from India, Japan, and Korea from 2005 through June 2007,

Glycine from India, Japan, and Korea, Inv. Nos. 731-TA-1111-1113, at IV-10, Table IV-3 (ITC

Dec. 2007) (final staff report to the Commission) (confidential version), available at App. in

Supp. of Mem. of Law in Supp. of Rule 56.2 Req. for J. Upon the Agency R. ("GEO's App.")

Tab 3 ("Confidential Staff Report").  Pharmaceutical grade glycine is sold at a price premium

over USP grade glycine.  Final Japan & Korea Determination at 3–4.  Technical grade glycine,

which is used in industrial applications, is sold at a price discount to USP grade glycine.  Id.

Typically, glycine is sold as a commodity grade product, and domestic and imported glycine of

the same grade are interchangeable.  Id. at 9.  The only domestic producers of glycine are GEO

and Chattem Chemicals, Inc. ("Chattem").  Id. at 3.  GEO is the larger of the two.[1]  Id. at 6.

---

[1] GEO "account[ed] for [[   ]] percent of domestic production in 2006, while Chattem accounted for [[   ]] percent."  Glycine from Japan and Korea, Inv. Nos. 731-TA-1112-1113, at 8 (ITC Jan. 2008) (final Commission opinion), available at GEO's App. Tab 1 ("Confidential Final Japan & Korea Determination").

*Confidential Data Deleted*

In March 2007, GEO filed a petition for the imposition of antidumping duties on glycine imports from India, Japan, and Korea. Id. at 3. After an investigation, the U.S. Department of Commerce determined that glycine imports from India, Japan, and Korea were being sold at less than fair value. Notice of Final Determination of Sales at Less Than Fair Value: Glycine from India, 73 Fed. Reg. 16640, 16640 (Dep't Commerce Mar. 28, 2008); Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances: Glycine from Japan, 72 Fed. Reg. 67271, 67271 (Dep't Commerce Nov. 28, 2007); Notice of Final Determination of Sales at Less Than Fair Value: Glycine from the Republic of Korea, 72 Fed. Reg. 67275, 67275 (Dep't Commerce Nov. 28, 2007). In January 2008, however, the Commission issued a final negative determination regarding glycine from Japan and Korea. Glycine from Japan and Korea, 73 Fed. Reg. 3484, 3484 (ITC Jan. 18, 2008) (final determination). In May 2008, the Commission issued a final negative determination regarding glycine from India. Glycine from India, 73 Fed. Reg. 26413, 26413 (ITC May 9, 2008) (final determination). The Commission determined that the domestic glycine industry was not materially injured by reason of imports from India, Japan, and Korea because although the volume of subject imports increased significantly, the imports did not significantly undersell, depress, or suppress prices for domestic glycine and did not have a significant adverse impact on the domestic industry. Final Japan & Korea Determination at 17–22.[2] The Commission found that the domestic industry's performance declined because purchasers decided to diversify

---

[2] The India determination adopted by reference the Japan and Korea determination's reasoning. Final India Determination at 3–9. Commissioners Irving A. Williamson and Dean A. Pinkert dissented from both determinations.

suppliers after GEO and its predecessor experienced supply problems.  Id. at 18, 21–22.  The

Commission further determined that the domestic glycine industry was not threatened with

material injury by reason of the subject imports.  Id. at 26.  GEO challenges the negative

determinations, claiming that the Commission's price, impact, and threat of material injury

determinations were not supported by substantial evidence and that the Commission applied the

wrong causation standard.  (GEO's Mem. of Law in Supp. of Rule 56.2 Req. for J. Upon the

Agency R. ("GEO's Br.") 6–39.)

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court must

uphold a final determination by the Commission unless it is "unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).

**DISCUSSION**

**I.      Negative Material Injury Determination**

GEO argues that the Commission's conclusion that the domestic glycine industry

was not materially injured by reason of imports was unsupported by substantial evidence.

(GEO's Br. 1–2.)  In making a material injury determination, the Commission must consider:

(1) the volume of subject imports, (2) the effect of subject imports on prices in the United States

for domestic like products, and (3) "the impact of [subject] imports . . . on domestic like

products, but only in the context of production operations within the United States."  19 U.S.C.

§ 1677(7)(B)(i).  Here, the Commission found that the volume of subject imports increased

significantly, but the domestic industry was not injured by reason of imports because the imports

did not have a significant effect on prices of domestic glycine in the United States and did not

have a significant adverse impact on the domestic industry.  Final Japan & Korea Determination

at 17–22.  GEO challenges the Commission's findings regarding the effect of the imports on

domestic glycine prices, the impact of the imports, and causation.[3]  (GEO's Br. 7–31.)  GEO's

challenges fail.

## A.  The effect of the imports on prices

> In evaluating the effect of imports . . . on prices, the Commission shall consider
> whether--
> (I) there has been significant price underselling by the imported merchandise as
> compared with the price of domestic like products of the United States, and
> (II) the effect of imports . . . otherwise depresses prices to a significant degree or
> prevents price increases . . . to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).  The Commission determined that "[s]ubject imports undersold the

domestic like product in 35 of 42 comparisons," but found "this underselling not to be

particularly significant" because the price comparisons included data from Chattem, which did

not attempt to compete with subject imports on price, and because the increase in subject imports

was attributable to the domestic industry's inability to satisfy domestic demand reliably.  Final

Japan & Korea Determination at 18.  The Commission found that subject imports did not depress

domestic glycine prices because prices increased overall during the period of investigation

("POI").  Id. at 19.  The Commission found that subject imports did not suppress domestic

glycine prices because the "[u]nit cost of goods sold ("COGS") fluctuated over the [POI], and

ended only somewhat higher in 2006 than in 2004," and the ratio of COGS to net sales decreased

---

[3] As expected, GEO does not challenge the Commission's finding that the volume of
subject imports increased.

between 2004 and 2006, indicating that the domestic industry was not faced with a significant

cost-price squeeze.  Id.  GEO challenges these findings.

     *1.  Chattem data*

        GEO argues that the Commission improperly discounted data showing that

subject imports undersold Chattem's products.  (GEO's Br. 12–16.)  The Commission found that

"subject imports undersold Chattem by significant margins in every available quarterly

comparison," but did not find the underselling significant because "Chattem concentrates on

pharmaceutical grade glycine and, to the extent it sold glycine in competition with subject

imports . . . , it did not attempt to compete on price."  Final Japan & Korea Determination at 18.

        The Commission must "examine the domestic producers, as a whole, of the like

product."  Timken Co. v. United States, 913 F. Supp. 580, 586 (CIT 1996).  Here, the

Commission analyzed the pricing data from both domestic glycine producers.  See Final Japan &

Korea Determination at 17–18.  Because GEO accounted for a larger proportion of domestic

glycine production, id. at 6, the Commission's decision not to rely heavily on data indicating

underselling of Chattem's products was reasonable, cf. Tropicana Prods., Inc. v. United States,

484 F. Supp. 2d 1330, 1341–42 (CIT 2007) (holding that the Commission's decision to rely

more heavily on data from domestic orange processors than from growers was reasonable).

Additionally, Chattem primarily produces pharmaceutical grade glycine, Final Japan & Korea

Determination at 18, whereas few or none of the subject imports consisted of pharmaceutical

grade glycine from 2004 through June 2007, Confidential Staff Report at IV-10, Table IV-3.

Chattem ships only domestic USP grade and technical grade glycine to "end users willing to pay

higher unit values than are available for similar product through imports" or GEO.  Glycine from

Japan and Korea, Inv. Nos. 731-TA-1112-1113, at III-4 (ITC Dec. 2007) (final staff report to the

Commission), available at http://hotdocs.usitc.gov/docs/pubs/701_731/pub3980.pdf ("Staff

Report").  Therefore, the Commission's decision to discount the underselling of Chattem

because Chattem does not attempt to compete with subject imports on price was reasonable.  See

Timken, 913 F. Supp. at 590 (holding that evidence of underselling is less significant where the

domestic product has a price premium).[4]

     *2.  Importance of reliable supply*

     GEO also challenges the Commission's finding that underselling was not

significant because U.S. purchasers sought subject imports to diversify their sources of supply

after GEO and its predecessor, Hampshire Chemical Corporation, a subsidiary of DOW

Chemicals, Inc. ("Hampshire/DOW"),[5] experienced supply problems.  (GEO's Br. 18–23.)  GEO

argues that pervasive underselling prompted the increases in imports because glycine is a

---

     [4] GEO also argues that subject imports regularly undersold GEO, unlike the usual mixed
pattern of over- and underselling for a commodity, which indicates that subject imports had a
substantial negative price effect.  (GEO's Br. 15–16.)  This argument may have some merit.
[[



     ]]
Confidential Final Japan & Korea Determination at Supplemental Table 7.  Nevertheless, the
Commission's finding that the harm to GEO arose from GEO's unreliable supply, rather than
underselling, was substantially supported, as discussed infra.

     [5] GEO purchased its glycine processing facility from Hampshire/DOW on November 1,
2005.  Final Japan & Korea Determination at 11.

*Confidential Data Deleted*

fungible commodity and purchasers also reported supply problems with imports.[6]  (Id.)

> Even in a commodity market, however, domestic supply problems may be significantly more responsible for increases in imports than underselling.  See Tropicana, 484 F. Supp. 2d at 1343–47.  Here, U.S. purchasers reported significant supply problems from GEO and indicated that they increasingly purchased imports to diversify their sources and ensure a reliable supply.[7]  Six purchasers reported allocations or delayed deliveries by GEO or Hampshire/DOW, and two purchasers reported that GEO or Hampshire/DOW broke supply contracts.  Staff Report at II-2 to -3.  Because of GEO's supply problems, four purchasers had to slow or shut down production, and at least three purchasers had to buy imported glycine at higher prices.  Id. at II-2.  Additionally, U.S. glycine purchasers reported that reliability of supply was more important than lowest price.[8]  See id. at II-9, Table II-3.  Although four purchasers reported allocations or

_____

[6] Although, as GEO states, Chattem suffered losses even though it did not have supply problems (GEO's Br. 22–23), data as to Chattem is not particularly probative, for the reasons stated above.

[7] For example, Nestle Purina PetCare Company ("Nestle"), [[          ]] U.S. purchaser of glycine, see Confidential Final Japan & Korea Determination at 18 n.69, reported in its questionnaire response that it had to diversify its supply to include higher-priced imports [[


]] (Mem. of Def. in Opp'n to Pl.'s Mot. for J. on the Agency R. App. ("Def.'s App.") Tab CD 133 at 5–6, 18–19).  According to GEO's data, Hampshire/DOW delayed [[          ]] shipments from November 2004 to October 2005, and GEO delayed [[          ]] shipments from November 2005 to December 2006 and [[          ]] shipments between January and September 2007.  (Def.'s App. Tab CD 172.).

[8] Sixteen purchasers rated reliability of supply very important, and one rated reliability of supply somewhat important; fifteen purchasers rated delivery time very important, and two rated delivery time somewhat important; and sixteen purchasers rated availability very important, and
(continued...)

*Confidential Data Deleted*

delayed deliveries by foreign suppliers, and three purchasers reported that foreign suppliers

broke contracts, <u>id.</u> at II-2 to -3, such evidence of foreign supply problems does not undermine

the Commission's finding that U.S. purchasers attempted to diversify their sources of supply.

Thus, while one could debate the relative importance of the sources of harm, substantial

evidence supported the Commission's final conclusion that purchasers increased their imports

because of GEO's unreliable supply, rather than underselling.[9]

  *3.  Data showing increased domestic prices*

    GEO contends that the Commission misleadingly used average unit values

("AUVs") to determine that domestic glycine prices increased during the POI because AUVs are

not appropriate where products of different grades have different prices.  (GEO's Br. 16–18.)

GEO further contends that the Commission should have relied on prices of USP grade glycine,

which is more competitive with imports.  (<u>Id.</u>)  AUV data may not be reliable where prices are

"strongly influenced by a few orders of particular grade or size."  <u>Allegheny Ludlum Corp. v.</u>

<u>United States</u>, 287 F.3d 1365, 1374 (Fed. Cir. 2002).  There is no evidence, however, that a few

---

   [8](...continued)
one rated availability somewhat important.  <u>Staff Report</u> at II-9, Table II-3.  By contrast, only
seven purchasers rated lowest price very important, and ten rated lowest price somewhat
important.  <u>Id.</u>

   [9] GEO asserts that the Commission's reliance on a post-hearing letter from Nestle was
improper.  (GEO's Br. at 18–21.)  The letter was [[

                            ]].  (Def.'s App. Tab
CD 160.)  The letter stated that Nestle considers GEO [[                              ]] and detailed Nestle's
problems with GEO.  (<u>Id.</u>)  There is no technical bar to acceptance of the letter and although this
information might have been more reliable if it had been presented as testimony at the hearing,
the purchaser questionnaire responses and other record evidence corroborate GEO's supply
problems.  (<u>See</u> Def.'s App. Tabs CD 106, CD 107, CD 110, CD 133.)

*Confidential Data Deleted*

aberrant orders significantly affected the AUVs, and here the Commission relied on both AUVs

and the weighted-average prices of USP grade glycine to determine that domestic glycine prices

increased overall.[10]  See Final Japan & Korea Determination at 19 & n.114 (citing Confidential

Staff Report at Table C-1 (AUV data); id. at Table V-2 (weighted-average product pricing data)).

Accordingly, substantial evidence supported the Commission's finding that subject imports did

not depress domestic glycine prices.

       *4.  The negative price suppression determination*

       GEO argues that subject imports suppressed glycine prices because the ratio of

COGS to net sales was poor, indicating that the domestic industry experienced a cost-price

squeeze.  (GEO's Br. 23.)  GEO argues that the Commission's analysis did not account for the

domestic producers' operating losses during the POI, the significant decrease in depreciation

costs after Hampshire/DOW stopped depreciating its assets in 2005, or the impact of sharply

rising demand in 2005.  (Id. at 24–26.)  These arguments are unavailing.

       When the COGS "exceeds price, the producer is unable to sell the product for

more than what it costs to produce the product; if the producer is unable to raise prices, the

industry finds itself in . . . a cost-price squeeze."  Nippon Steel Corp. v. United States, 458 F.3d

_____

     [10] The AUVs of domestic glycine increased from [[     ]] in 2004 to [[     ]] in 2005 to
[[    ]] in 2006, and ended at [[    ]] in January–June 2007.  Confidential Staff Report at I-
16, Table I-3, C-4, Table C-1.  The weighted-average prices of USP grade glycine fluctuated
from [[    ]] in January–March 2004 and [[    ]] in April–June 2004 to [[    ]] by
January–March 2005 to [[    ]] by October–December 2006, and ended at [[    ]] in
January–June 2007.  Id. at V-7, Table V-2.  The latter data, upon which GEO relies (see GEO's
Br. 16–18; GEO's Reply Br. 8–10), is not strikingly different from the AUV data and does not
clearly demonstrate price depression.

                                            *Confidential Data Deleted*

1345, 1354 n.4 (Fed. Cir. 2006).  The Commission found that unit COGS fluctuated between

2004 and interim 2007 and that the ratio of COGS to net sales decreased between 2004 and

interim 2007.[11]  Final Japan & Korea Determination at 19.  The Commission "thus [found] no

consistent evidence that the industry is faced with a significant cost/price squeeze, and thus no

consistent evidence [of] significant price suppression."  Id.

        Although the record provides some evidence of a modest cost-price squeeze, the

Commission could conclude that the price suppression caused by subject imports was not

significant.  "Such a determination does not mean that price . . . suppression was nonexistent;

rather, the . . . suppressive effects of subject imports did not rise to an actionable level under the

antidumping statute."  Nitrogen Solutions Fair Trade Comm. v. United States, 358 F. Supp. 2d

1314, 1326 (CIT 2005).  The domestic industry faced operating losses during the POI, but those

losses decreased overall.[12]  Final Japan & Korea Determination at 21.  Additionally, although the

Commission's Final Determination did not mention that COGS decreased in 2005 partly because

Hampshire/DOW stopped depreciating its assets in anticipation of the transfer of its facility to

GEO, see id. at 33 (Commissioners Williamson & Pinkert, dissenting), the Commission

calculated COGS based on the information provided by GEO, which could have estimated its

---

[11] Specifically, unit COGs fluctuated from [[       ]] in 2004 to [[       ]] in 2005 to
[[     ]] in 2006 to [[       ]] in January–June 2007, and the ratio of COGS to net sales
decreased from [[            ]] in 2004 to [[            ]] in 2005, [[            ]] in 2006,
and [[            ]] in January–June 2007.  Confidential Staff Report at C-4, Table C-1.

[12] The domestic industry's operating losses decreased from [[            ]] in 2004 to
[[        ]] in 2005, and ended at [[           ]] in 2006.  Confidential Staff Report at VI-2,
Table VI-1.

*Confidential Data Deleted*

own depreciation costs after acquiring the Hampshire/DOW facility in November 2005.[13]

Finally, GEO's argument that sharply rising demand in 2005 reduced costs by allowing more

efficient production and higher capacity utilization (GEO's Br. 26 & n.96) is consistent with the

Commission's conclusion that the industry did not face a significant cost-price squeeze.

## B.  The impact of the imports

GEO challenges the Commission's impact analysis, arguing that the Commission

ignored evidence that imports caused lost sales and lost revenues for the domestic glycine

industry.  (GEO's Br. 27–28.)  In examining the impact of subject imports on the domestic

industry, the Commission must "evaluate all relevant economic factors which have a bearing on

the state of the industry in the United States," including lost sales and revenues.[14]  19 U.S.C.

§ 1677(7)(C)(iii).  Here, the Commission determined that subject imports did not cause GEO's

problems, which were "mostly self-inflicted," and that subject imports did not cause the lost

---

[13] The Commission adopted GEO's report that its total unit COGS, including
depreciation, fluctuated between [[      ]] in 2004, [[      ]] in 2005, [[      ]] in 2006, and
[[    ]] in January–June 2007.  See Confidential Staff Report at VI-4, Table VI-2; GEO's
Economic Analysis for the Final Investigation Table 4, GEO's App. Tab 8.

[14] Such factors include:

(I) actual and potential decline in output, sales, market share, profits, productivity,
return on investments, and utilization of capacity,
(II) factors affecting domestic prices,
(III) actual and potential negative effects on cash flow, inventories, employment,
wages, growth, ability to raise capital, and investment,
(IV) actual and potential negative effects on the existing development and
production efforts of the domestic industry, . . . and
(V) . . . the magnitude of the margin of dumping.

19 U.S.C. § 1677(7)(C)(iii).

*Confidential Data Deleted*

sales and revenues that GEO alleged, "as [[    ]] of the allegations were confirmed."[15]

Confidential Final Japan & Korea Determination at 34 n.140 (internal quotations and citation

omitted).  Substantial evidence therefore supported the Commission's determination that subject

imports did not cause lost sales and lost revenue.  In any event, "lost sales alone do not mandate

an affirmative finding of injury; rather the Commission must determine whether lost sales,

together with other factors, indicate a causal nexus between the imports at less than fair value

and material injury to the domestic industry."  Maverick Tube Corp. v. United States, 687 F.

Supp. 1569, 1575 (CIT 1988).  Because lost sales and other factors did not indicate such a causal

nexus, see Final Japan & Korea Determination at 22 & n.140, the Commission's overall impact

determination was substantially supported.[16]

## C.      Causation

            GEO contends that the Commission applied the wrong causation standard.

(GEO's Br. 29–30.)  GEO asserts that because there are multiple potential causes of injury, the

Commission should have analyzed whether the subject imports contributed to the U.S. industry's

---

[15] The Confidential Staff Report addressed all of the allegations of lost sales in GEO's
petition to the Commission.  See Confidential Staff Report at V-14 to -19; GEO's Petition at
27–32, available at GEO's App. Tab 7.  [[
            ]] Confidential Staff Report at V-15, Table V-7.  [[
                                                                                      ]] Id. at V-15 to -16.

[16] GEO also argues that the Commission's impact analysis was flawed because the
Commission determined that factors other than subject imports accounted for the domestic
industry's performance during the POI , as detailed in the Commission's price effects discussion.
(GEO's Br. 27.)  Because substantial evidence supported the Commission's determination that
factors such as GEO's supply problems accounted for the domestic industry's performance, this
argument also lacks merit.

*Confidential Data Deleted*

material injury in a legally significant way.  (Id.)  Contrary to GEO's assertion, the Commission

applied the correct standard.

   The Commission must determine whether a domestic injury has suffered material

injury "by reason of" the subject imports.  19 U.S.C. § 1673d(b)(1).  The Commission must

examine other possible causes of the injury, and the evidence must show "that the subject

imports are causing the injury, not simply contributing to the injury in a tangential or minimal

way." Taiwan Semiconductors Indus. Ass'n v. ITC, 266 F.3d 1339, 1345 (Fed. Cir. 2001).  The

subject imports, however, may only be a substantial factor and "need not be the sole or principal

cause of injury."  Nippon Steel Corp. v. ITC, 345 F.3d 1379, 1381 (Fed. Cir. 2003).

   Here, the Commission concluded that "the subject imports are not contributing

significantly to the domestic industry's poor financial condition" and that "the record does not

demonstrate the requisite causal nexus between the subject imports and the condition of the

domestic industry." Final Japan & Korea Determination at 22.  After examining other possible

causes of the domestic industry's condition, particularly GEO's supply problems, the

Commission decided that the subject imports were not a substantial factor contributing to the

domestic industry's condition.  Id. at 21–22.  The Commission did not reach a negative injury

determination based on a finding that imports were a significant cause among other causes.  It

simply found that imports were not a significant cause.  Such a causation analysis is appropriate.

## II. Negative Threat of Material Injury Determination

   Finally, GEO challenges the Commission's determination that the domestic

industry was not threatened with material injury by reason of subject imports.  (GEO's Br.

31–39.)  GEO claims that the Commission drew improper adverse inferences against the

domestic industry when foreign producers did not submit complete data regarding such

economic factors as their capacity, unused production capacity, and anticipated future exports,

contrary to the Commission's usual practice of drawing adverse inferences against non-

responsive producers.  (Id. at 32–33.)  GEO further claims that substantial evidence did not

support the Commission's conclusion that there would be only "some" increase in subject

imports based on the Commission's estimate of foreign producers' excess capacity.[17]  (Id. at

34–39.)  These claims also fail.

        In determining whether subject imports threaten the domestic industry with

material injury, the Commission must consider relevant economic factors, including "any

existing unused production capacity or imminent, substantial increase in production capacity in

the exporting country indicating the likelihood of substantially increased imports of the subject

---

[17] The Commission also concluded that there was no strong correlation between domestic prices and import volumes during the POI, noting that "[t]he highest domestic prices for [USP grade glycine] were observed in 2005, a year in which subject imports' share of U.S. consumption (by volume) increased . . . and the domestic producers' share fell."  Final Japan & Korea Determination at 25.  GEO asserts that a sharp increase in demand in 2005 caused the rise in prices.  (GEO's Br. 34–35.)  Assuming this assertion is true, it is consistent with the Commission's conclusion that factors other than import volumes drove the price changes during the POI.  Additionally, the volume of subject imports of USP grade glycine increased over the POI from [[          ]] pounds in 2004 to [[          ]] pounds in 2005 to [[          ]] pounds in 2006, Confidential Staff Report at IV-4, Table IV-2, and the total volume of imports increased from 5,233,000 pounds in 2004 to 7,915,000 pounds in 2005 to 8,971,000 pounds in 2006, Staff Report at IV-3, Table IV-2, while domestic prices of USP grade glycine fluctuated and ended at a slightly higher level than prices at the beginning of the POI, see Confidential Staff Report at V-7, Table V-2.  Because prices did not decline as the volume of subject imports increased, the Commission could conclude that there was no strong correlation between domestic prices and import volumes.

*Confidential Data Deleted*

merchandise into the United States."[18]  19 U.S.C. § 1677(7)(F)(i)(II).  Here, the Commission

found that "the total exports to the United States projected by the Indian and Japanese producers

combined will not exceed their combined volume of exports in 2006" but concluded that "some

increase in the volume of subject imports . . . is likely" because the Indian and Japanese

industries have substantial unused capacity and are increasingly export-oriented.  Final Japan &

Korea Determination at 24–25.

   The Commission did not draw any adverse inferences; the Commission merely

made projections from the information available.  Based on information from the responding

Japanese producer and exporters,[19] the Commission estimated the Japanese firms' capacities,

---

[18] Other relevant factors include:

 (III) a significant rate of increase of the volume or market penetration of imports
of the subject merchandise indicating the likelihood of substantially increased
imports,
 (IV) whether imports of the subject merchandise are entering at prices that are
likely to have a significant depressing or suppressing effect on domestic prices,
and are likely to increase demand for further imports,
 (V) inventories of the subject merchandise,
 (VI) the potential for product-shifting if production facilities in the foreign
country, which can be used to produce the subject merchandise, are currently
being used to produce other products, . . .
 (VIII) the actual and potential negative effects on the existing development and
production efforts of the domestic industry . . . , and
 (IX) any other demonstrable adverse trends that indicate the probability that there
is likely to be material injury by reason of [subject] imports.

19 U.S.C. § 1677(7)(F)(i).

[19] According to U.S. importers' questionnaire responses, all U.S. glycine imports from
Japan are produced by Showa Denko and Yuki Gosei.  Staff Report at VII-4.  Yuki Gosei and
three firms that export Japanese glycine to the United States responded to questionnaires, but
Showa Denko did not.  Id.

expected future capacities, and anticipated future exports.[20]  See Confidential Staff Report at

VII-8, Table VII-4.  Although the Commission never received any responses to Korean producer

questionnaires, the Commission reasonably concluded "based on the available evidence" that

Korea Bio-Gen Co. Ltd., the principal Korean producer, has the capacity to export at least [[    ]]

million pounds "and likely also has some unused capacity."  Confidential Final Japan & Korea

Determination at 37 n.147.  GEO concedes that Indian producers provided complete data.[21]

(GEO's Br. 32.)  The Commission rejected the foreign producers' projections that imports would

decrease.  See Final Japan & Korea Determination at 25.

             GEO's assertion that the Commission usually draws adverse inferences against

non-responsive parties is incorrect.  The Commission is not required to draw an adverse

inference against a party who "has failed to cooperate by not acting to the best of its ability to

comply with a request for information," although it may do so.  19 U.S.C. § 1677e(b).  The

---

[20] Japanese producers had a capacity of [[    ]] million pounds each year in 2004, 2005, and 2006, and the producer and exporters projected capacity to remain at that level in 2007 and 2008.  Confidential Final Japan & Korea Determination at 37 n.147.  Japanese exports to the United States increased from [[         ]] pounds in 2004 to [[         ]] pounds in 2005 to [[         ]] pounds in 2006.  Confidential Staff Report at VII-8, Table VII-4.  The Japanese producer and exporters projected that they would export [[         ]] pounds to the United States in 2007 and [[         ]] pounds to the United States in 2008.  Id.

[21] Based on questionnaire responses, Indian producers had a capacity of [[

   ]].  Glycine from India, Inv. No. 731-TA-1111, at I-11, Table 8 (Apr. 2008) (final staff report to the Commission) (confidential version), available at GEO's App. Tab 4.  Indian producers reported that exports to the United States increased [[
                                                              ]].  Id.  Indian producers projected that they would export [[         ]] pounds to the United States in 2007 and [[         ]] pounds to the United States in 2008.  Id.

*Confidential Data Deleted*

Commission prefers to "strive [for] the most reasonable estimate" and rely upon the most

accurate data available.  Asociacion De Productores De Salmon y Trucha De Chile AG v. ITC,

180 F. Supp. 2d 1360, 1368 (CIT 2002) (internal quotations and citation omitted); see Lawn and

Garden Steel Fence Posts from China, USITC Pub. No. 3598, Inv. No. 731-TA-1010, at n.96

(June 2003), available at 2003 WL 21494593 ("While the Commission has the discretion to take

adverse inferences against all of the non-responding Chinese producers, we have frequently

stated that the ability to take adverse inferences does not relieve the Commission of its obligation

to consider the record evidence as a whole in making its determination and to draw reasonable

inferences from all the record evidence.").  Unlike the Department of Commerce, which often

draws adverse inferences against particular non-cooperative companies when calculating

dumping margins, see, e.g., Notice of Final Determination of Sales at Less Than Fair Value and

Affirmative Final Determination of Critical Circumstances: Glycine from Japan, 72 Fed. Reg. at

67272; Notice of Final Determination of Sales at Less Than Fair Value: Glycine from the

Republic of Korea, 72 Fed. Reg. at 67275, the Commission rarely draws adverse inferences

because its decisions affect all industry participants, see Statement of Administrative Action to

the Uruguay Round Agreements Act, H.R. Rep. No. 103-316 (1994), as reprinted in 1994

U.S.C.C.A.N. 4040, 4198–99.

      Further, GEO does not challenge the Commission's determination that other

economic factors relevant to an affirmative finding of threat of material injury were not satisfied.

Because the Commission must consider economic factors indicating threat of material injury "as

a whole," and the presence or absence of any particular factor is not dispositive, 19 U.S.C.

§ 1677(7)(F)(ii), substantial evidence supports the Commission's threat of material injury

determination.

## CONCLUSION

For the foregoing reasons, the Commission's determination that the domestic

industry was not materially injured or threatened with material injury by reason of subject

imports was supported by substantial evidence and in accordance with law.  Accordingly, GEO's

motion for judgment on the agency record is denied and judgment will be entered for defendant.


                                                                    /s/ Jane A. Restani
                                                                 Jane A. Restani
                                                                 Chief Judge


Dated: This 19th day of February, 2009.
          New York, New York.

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| GEO SPECIALTY CHEMICALS, INC., | : |
| | : |
| Plaintiff, | : |
| v. | : Before: Jane A. Restani, Chief Judge |
| | : |
| UNITED STATES, | : Court No.  08-00046 |
| | : |
| Defendant. | : |

### JUDGMENT

This case having been duly submitted for decision; and the court, after due deliberation, having rendered a decision herein; Now therefore, in conformity with said decision, it is hereby

ORDERED that Plaintiff GEO Specialty Chemicals, Inc.'s Motion for Judgment on the Agency Record is denied and the Determination of the International Trade Commission is sustained.

        /s/ Jane A. Restani
             Jane A. Restani
             Chief Judge

Dated: This 19th day of February, 2009.
        New York, New York.

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                         Deputy Clerk